## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ELLIOTT GREENLEAF & SIEDZIKOWSKI P.C.**<br>50 S. 16th Street; Suite 2960<br>Philadelphia, PA  19102 | : |
| **Plaintiff** | : |
| | : |
| **v.** | : |
| | : |
| **WILLIAM R. BALABAN**<br>312 N. 26th Street<br>Camp Hill, PA  17011; | :  C.A. No.  12-_____ |
| | : |
| **CHARLES L. HERRON**<br>5511 Blenner Road<br>McKean, PA  16426; | : |
| | : |
| **PAMELA HERRON**<br>5511 Blenner Road<br>McKean, PA  16426; and, | : |
| | : |
| **STEVENS & LEE**<br>1818 Market Street; 29th Floor<br>Philadelphia, PA 19103 | : |
| **Defendants** | : |

## COMPLAINT

Plaintiff Elliott Greenleaf and Siedzikowski, P.C. ("EGS") seeks, *inter alia,*

equitable relief to enjoin Defendants' on-going criminal, civil and fiduciary misconduct,

and to protect its, and its clients', confidential, proprietary and trade secret information,

and compensatory and punitive damages, attorneys fees and costs, including: (1)

compensatory and statutory damages pursuant to the Computer Fraud and Abuse Act, 18

U.S.C. §1030 *et seq.* ("CFAA"); (2) compensatory and statutory damages, and attorneys

fees, pursuant to Pennsylvania's Trade Secrets Act;  (3) compensatory and punitive

damages for conversion of EGS' computers, data and over 78,000 files from its computer systems; (4) compensatory and punitive damages for breach of fiduciary duty; (5) compensatory and punitive damages for unfair competition; (6) compensatory and punitive damages for tortious interference; and (7) compensatory and punitive damages for conspiracy and aiding and abetting:

1.   To further their conspiracy to steal EGS' confidential and proprietary information, trade secrets, and present and prospective business opportunities, Defendants, and those acting in concert with them, have illegally accessed, and continue to illegally access, EGS' protected computer system where its, and its clients', confidential information and data are stored, through spy software secretly implanted on EGS' computer systems by Defendant William R. Balaban, Esq. ("Defendant Balaban"), a former employee, director, officer and managing shareholder of EGS, who regularly met with, and communicated with, EGS attorneys and clients at its offices in Blue Bell and Philadelphia, prior to his abrupt, without notice, January 31, 2012 resignation from EGS.

2.   Defendant Balaban, and those acting in concert with him, secretly configured this software to ensure that over 78,000 files of electronically stored and encrypted information of EGS, and its clients, were stolen and automatically transmitted to a distant "cloud", which is, and continues to be, accessed by them from computers outside of EGS.

3.   This unauthorized software, secretly planted by Defendant Balaban into EGS' computer systems, continues to allow Defendants a secret, direct, on-going electronic gateway into the confidential and proprietary information and trade secrets of

EGS and its clients, to secretly divert and monitor EGS' electronically stored data and information, and access and alter those files, on an ongoing basis to illegally and unfairly compete for business through Defendant Stevens & Lee.

4.     To attempt to cover-up Defendant Balaban's flagrant breaches of his fiduciary duties to EGS, he, and those acting in concert with him, who will be identified in discovery and added as defendants, deleted nearly 5% of the back-up data on an EGS server, just prior to his January 31, 2012 resignation.

## PARTIES

5.     Plaintiff Elliott Greenleaf & Siedzikowski, P.C.. is a Pennsylvania professional corporation providing legal services to its clients ("EGS"), with its principal office in this District and an office in Philadelphia.

6.     Defendant William R. Balaban ("Defendant Balaban") was, until he abruptly, and without notice, on January 31, 2012 resigned to join Stevens & Lee ("S&L"), an employee, managing shareholder, officer and a member of EGS' board of directors.

7.     Defendant Charles Herron is the former President of Municipal Revenue Services ("MRS") and its current Vice President. Defendant Pamela Herron, his wife, is the President of MRS (collectively, "Defendants Herron").    She replaced Defendant Charles Herron after media reports and public disclosures of his arrest and alleged unethical misconduct, as set forth herein, permeated Pennsylvania's tax lien market, which is comprised of public taxing entities and their elected officials. MRS facilitates the sale of tax liens which are valuable public assets of Pennsylvania taxing entities.

8.      Defendant Stevens & Lee ("S&L") is a Pennsylvania corporation providing legal, lobbying and investment banking services with an office located in Philadelphia, Pennsylvania.  It regularly transacts business in this District, including through Defendant Balaban and its associates, Matthew D. Coble, Esq. ("Coble") and Kathryn L. Mason, Esq. ("Mason").

9.      Discovery of Defendants' continuing electronic theft of EGS', and its clients', trade secrets, and confidential and proprietary information, will further identify those acting in concert with Defendants, including those who have failed to disclose and stop Defendants' misconduct, contrary to their fiduciary and ethical obligations, and who will be added as Defendants.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 and the Computer Fraud Abuse Act, 18 U.S.C. § 1030 et seq.   This Court has personal jurisdiction over Defendants as each conducts substantial business in this District and their illegal misconduct is specifically motivated to affect commerce in this District and in interstate commerce.

11.      Venue is appropriate in this District, as the material misconduct set forth herein occurred, and continues to occur, in this District.

## FACTS COMMON TO ALL COUNTS

12.      As a trusted employee, officer, director and shareholder of EGS for over a decade, Defendant Balaban had fiduciary duties to act with due care, loyalty, and good faith, and was required to act with honesty of purpose, and at all times in the best interests EGS and its clients.

13.    EGS provided Defendant Balaban, and his co-conspirators, including, *inter alia,* Coble and Mason with desktop and laptop computers that are tied into EGS' computer systems and servers.  As a result of EGS' investment, these computers then link into EGS' servers in Philadelphia and Blue Bell, in the Eastern District of Pennsylvania, and allow Defendant Balaban, and his co-conspirators, access to EGS', and its clients', data.

14.    EGS invested substantial time and money developing, purchasing, installing, and providing VPN controlled access to all computers for their lawyers' remote access, including Defendant Balaban, Coble and Mason, while ensuring that EGS protected its data, and knew of any changes to its computer information and system. VPN is widely-recognized software purchased by EGS to allow secure remote access supervised by EGS.   EGS' electronic data is "backed-up" and saved for each server, including a server in EGS' office managed by Defendant Balaban.

15.    EGS retains a computer professional to update, remediate and ensure the safety and security of its electronic data, including its client confidential data and communications.

16.    To further protect its, and its clients', confidential data, EGS only allows access to its computer systems by employees with double password access, known and supervised by EGS.  Upon any employee's departure, EGS shuts down password access to its computer systems, and analyzes the data on EGS' computers used by the departed employee.

### a. EGS represented MRS in a federal litigation and represents purchasers in many tax lien transactions.

17.     Defendants Herron facilitate the sale of tax liens to public entities, such as redevelopment authorities, who then monetize them for the public taxing entities that own these tax liens, such as school districts, counties and municipalities.

18.     From 2004 through July 29, 2011, MRS' principal competitor for the sale of Pennsylvania tax liens was Xspand, which was funded by, and subsequently acquired by, major Wall Street investment banks, initially Bear Stearns, and ultimately J.P. Morgan Chase & Co.

19.     EGS has acted as counsel for various Pennsylvania public entities involved in tax lien transactions. EGS lawyers, including Defendant Balaban, Coble and Mason, worked substantial hours in preparing the documents and reviewing transactions for EGS clients which regularly close in the February to April time frame.

20.     Defendant Balaban, an employee, officer, director, and managing shareholder of EGS, was trusted by EGS to play a leading role in these tax lien transactions.   He was assisted by EGS' employees Coble since 2008 and Mason since 2009.

21.     Beginning in 2004, Xspand attacked MRS in the tax lien market place in various ways, that MRS and Defendants Herron believed violated federal and state law, including characterizing MRS' transactions as not true sales, but instead creating debt. Debt is understandably undesirable to public officials and taxing entities. At that time, MRS was a start up company with two employees, Defendants Herron.  They and MRS requested EGS to take legal action to protect them from Xspand's attacks.

22.   EGS agreed to defer payment for its legal services until after the litigation was concluded in reliance upon Defendants Herrons' and MRS' promises, including to reimburse EGS for its out of pocket costs on a current basis.

23.   During this hard fought six year federal court litigation, issues repeatedly arose in the media reporting the actions of public agencies and officials that characterized Charles Herron in a manner highly detrimental to him and MRS.

24.   These public disclosures included media reports, public records, and the actions of public officials and agencies that repeatedly identified Defendant Charles Herron as being accused of stealing confidential and proprietary information from the City of Erie; being criminally charged for soliciting prostitution; being charged with ethics violations by the Pennsylvania State Ethics Commission; and being accused of consumer fraud by the Attorney General of the Commonwealth of Pennsylvania.

25.   These public disclosures inevitably seeped from the tax lien sale marketplace into the federal court litigation.  EGS successfully protected Defendants Herron's business interests from its chief competitor's attempts to further inject these issues into the federal litigation.

26.   Defendant Balaban failed to fully disclose the nature and extent of his knowledge of Defendant Charles Herron's alleged and publically reported misconduct.  If he had, EGS could have terminated its representation of him and MRS.  Instead, in violation of his fiduciary duties, Defendant Balaban misled EGS, and vouched for Defendants Herron and MRS.

27.   As a result of the misrepresentations and nondisclosures by Defendants Balaban and Herrons, EGS has been victimized by misconduct strikingly similar to

7

Defendant Charles Herron's alleged theft of confidential information from the City of Erie that resulted in the Pennsylvania State Ethics Commission's charges against him.

28.    The pendency and effect of the federal litigation helped minimize the adverse impact of these issues, and shortly after its conclusion, MRS' and Defendants Herrons' primary competitor Xspand exited the Pennsylvania tax lien sale marketplace completely.

29.    On July 29, 2011, shortly after the termination of the federal litigation, JP Morgan announced that "the firm would begin exiting its tax lien business, Plymouth Park Tax Services, LLC, which also operated under the name Xspand." JP Morgan also announced that Xspand would not pursue any new business effective immediately. Xspand, a subsidiary of JP Morgan Chase & Co., was acquired along with JP Morgan Chase's 2008 acquisition of Bear Stearns.

30.    After EGS' six years of legal services in the federal court litigation effectively removed their chief competitor, Defendants Herron and MRS repeatedly and appreciatively told EGS and Defendant Balaban that EGS "saved MRS and them," and promised to arrange payment of EGS' legal fees and costs. Throughout the pendency, and with the protection of this federal court litigation, MRS' business grew considerably. Defendants Herron told EGS and Defendant Balaban that MRS' business would double in 2012, and grow substantially thereafter.

31.    After the federal litigation concluded in July 2011 and Xspand withdrew from the Pennsylvania tax lien market place, in reliance upon Herrons' and MRS' promises, EGS sought payment of its long overdue legal fees and costs.

32.   EGS requested its employee, managing shareholder, director and officer, Defendant Balaban, to arrange for payment of its legal fees and costs, as part of his fiduciary obligations to EGS.

33.   Defendant Balaban repeatedly represented to EGS that he was working with Defendants Herron to secure payment.

**B.    Defendants Herron conspire with Defendant Balaban to breach his fiduciary duties.**

34.   After inducing Plaintiff's six year representation in federal court litigation, Defendants Herron and MRS secretly conspired with Defendant Balaban to breach his fiduciary duties to EGS, and its clients, in a scheme to not only avoid payment of EGS' legal fees and costs, but to also eventually divert present and prospective business opportunities from EGS to Defendants Balaban and his new employer, Defendant S&L.

35.   As part of his conspiracy with Defendants Herron and MRS, and in violation of his fiduciary duties owed to EGS, Defendant Balaban, and co-conspirators Coble, Mason and others, who will be identified in discovery and may be added as defendants (collectively "Balaban's co-conspirators"), secretly conspired to electronically steal EGS' clients as early as Fall 2011.

36.   Defendants Balaban, Herron and S&L know that EGS represents certain purchasers of tax liens, who are public entities, in transactions facilitated by MRS, and the EGS worked  substantial hours throughout the year to prepare for tax lien sales closings.

37.   In reliance upon Defendant Balaban's representations to EGS that he needed his wife Robin to assist him in EGS' tax lien transactions, EGS hired her on a full time basis.  Discovery will now reveal what he and she were really doing.

38.    Their scheme was also timed to coincide with the lucrative annual February-April 2012 cycle of delinquent tax lien sales, and renewals, by Pennsylvania public taxing entities.  This is the most lucrative time of the year for Defendants MRS and Herron, who have repeatedly stated that, with Xspand driven from the Pennsylvania tax lien marketplace, MRS' tax lien business will double in 2012.

39.    Beginning at least as early as the fall of 2011, Defendants Balaban, Herron, and Coble and Mason contacted taxing entities that were scheduled to sell their tax liens in 2012, and without disclosing their true underlying motives, advised them that these taxing entities needed to pass new resolutions, allowing the 2012 sale of their tax liens to proceed utilizing purchasers other than those already approved by the taxing entities and represented by EGS.

40.    A real, but undisclosed, motive for this interference was so that when Defendant Balaban resigned from EGS effective immediately, and became employed by S&L, he and Defendants Herron could replace the original purchaser approved in these transactions (represented by EGS) with a compliant purchaser that was controlled by Defendants Herron if the original purchaser would not agree to change its counsel from EGS to Defendant S&L.

41.    One such alternative purchaser is Northwest Pennsylvania Incubator Association, contrived and controlled by Defendants Herron, with an address at their office, to divert the business of EGS clients in the purchase of tax liens.

42.    In this deceptive manner, Defendants Balaban, Herron and MRS impaired the legal rights and interest of EGS, and its existing clients (tax lien purchasers), while

Defendant Balaban was a trusted EGS employee, director, officer and a managing shareholder.

43.     Defendant Balaban specifically directed business opportunities away from EGS, and its clients, and to new entities being formed by Defendants Herron as part of their scheme.

**C.     While an EGS fiduciary, Defendant Balaban and the Balaban co-conspirators delete EGS' electronic files, and secretly install "Dropbox" cloud software to electronically steal over 78,000 files of EGS' confidential and proprietary business information.**

44.     Having breached his fiduciary duties by misrepresenting facts to taxing entities to divert business away from existing EGS' clients who purchased tax liens, Defendant Balaban began to electronically delete and steal EGS' valuable files necessary for the representations.

45.     As part of this scheme, as only discovered after his January 31, 2012 resignation, Defendant Balaban, through electronic means, secretly stole and transferred over seventy-eight thousand files (approximately 45.00 giga-byte) of EGS', and its clients', files and information from EGS' computer system to a remote internet location, known as a "cloud", where it could be accessed and used by him, and those acting in concert with him, Defendants Herron and the Balaban co-conspirators without EGS' knowledge and permission.

46.     In furtherance of his conspiracy with Defendants and Balaban's co-conspirators, Defendant Balaban timed this electronic theft of EGS', and its clients', confidential and proprietary information so that the information would be implanted and

secured on the cloud before his planned January 31, 2012 abrupt resignation from EGS and his simultaneous hiring by Defendant S&L.

47.     To implement this conspiracy, Defendant Balaban, and the Balaban co-conspirators, secretly installed software associated with "Dropbox" on EGS' computers.

48.     Specifically, Defendant Balaban and the Balaban co-conspirator Coble secretly installed the Dropbox software on EGS' laptop protected computer on December 5, 2011. Defendants refuse to allow EGS access to the remaining EGS computers locked in Defendant Balaban's personal office, but the installation date of the dropbox software on the remaining computers is discoverable immediately upon production.

49.     This Dropbox "cloud" software allowed Defendant Balaban to obtain a private password, and then automatically transfer and record confidential metadata, website and files from EGS' computers and handheld devices in their control, onto a website-hosted "shared network" in the "cloud."

50.     Defendant Balaban secretly configured this software to insure that the files of EGS and its clients, including tax lien purchasers, would be automatically electronically copied onto a "cloud," whose access was exclusively controlled by passwords known only to Defendant Balaban, Coble, Mason and those acting in concert with them.

51.     To further this on-going criminal and civil misconduct, Defendant Balaban and the Balaban co-conspirators failed to disclose this secret Dropbox software to EGS. As Defendant Balaban, Coble and Mason knew, EGS does not permit the unauthorized installation of personal software on its computers.

52.     Defendant Balaban's secret "cloud" software allows automatic "syncing". As such, any changes Balaban makes to a file or metadata on EGS' protected computers or on the files on the "cloud", will automatically change the metadata and files on the other device.   Their secret spy software automatically syncs between their EGS work computer stations and their secret "cloud", so that any document on EGS' computers can be automatically copied *verbatim* to their "cloud". The "cloud" thus secretly steals and duplicates the data from EGS' computer system, including all edits, changes or alterations to those client files. Conversely, Defendants' edits to EGS', and its clients', files secretly stolen and transferred to the "cloud," automatically changes the data on EGS' computers.

53.     The "cloud's" automatic sync feature provides automatic updates, such that the minute the Defendants, through secret passwords, sign on to either the "cloud" or their protected computers, all files transferred to the "cloud" are irretrievably altered.

54.     Unlike a hard drive, flash drive, CD-ROM or other static storage device, the "cloud" is an interactive data source, allowing Defendant Balaban, and those acting in concert with him, to use their secret passwords to access and change files in EGS' server, and to continue to monitor activity on EGS' secretly stolen electronic records from a remote location.

55.     Dropbox advises its purchasers that it is not liable for any loss or corruption to files and metadata, or any costs or expenses associated with preserving the confidential data.

56.     Dropbox is permitted to, and does, view the transferred files and share them with third parties, including Amazon which stores many of the transferred files.

Further, to the extent Dropbox is sold or merged into another third party, the confidential information is sold to an unknown third party.

57.     Dropbox employees can access this attorney client information without notice to the law firm or client that their attorney client communications can be accessed by any Dropbox employee, or any person holding a password, or hacking into the cloud.

58.     Not surprisingly, Dropbox software is a criticized software program subject to investigations and lawsuits arising from increasing concern for the security of the data placed on protected computers and then transferred to a shared internet-based network.

59.     Defendant Balaban and the Balaban co-conspirators knew or should have known, from multiple widely published accounts and at least one federal court class action lawsuit filed shortly before they implanted this secret software, that Dropbox software had a data breach in June 2011 in which 25 million accounts were allegedly compromised due to a defect in the software which allowed any person with a password to access any shared business or confidential file.

60.     Defendant Balaban and the Balaban co-conspirators, also knew or should have known, from his managerial and fiduciary positions of trust, of the widely published press reports in August 2011 of employee theft of employers' confidential trade secret data through the use of Dropbox software and placing the information on a "cloud" to use after departure.   Defendant Balaban's secret installation of this software in light of these widespread press releases is reckless and further breaches his fiduciary duties to EGS.

61.     Subject to Defendants' return of EGS' computers, and their forensic analysis, EGS' initial analysis learned Defendant Balaban, Coble, Mason, and those

acting in concert with them, have electronically stolen EGS', and its clients', confidential information to their secret "cloud", and continue to use this stolen confidential and proprietary information for use by Defendant S&L in its competitive efforts.

62.    Defendant Balaban and his co-conspirators have exclusive remote access for alterations and surveillance into and through the cloud.

63.    Thus, Defendants' secretly created documents on their "cloud" that are synced into the computer work stations and devices owned by EGS, are not shared in EGS' common document management system.

64.    As such, EGS cannot determine, contrary to its VPN mandates and protocols, the full nature and extent of Defendants' access to, and alterations of, EGS' client files and trade secret data.

65.    To further their conspiracy, by way of illustration only, on January 20-22, 2012, Defendant Balaban, and those acting in concert with him, deleted approximately five percent (5%) of the data stored on EGS' backup tapes in EGS' office managed by Defendant Balaban.

> **D.    Defendant Balaban and the Balaban co-conspirators abruptly leave EGS, convert EGS' computers and abuse their illegal spy software to steal the confidential and proprietary information of EGS, and its clients, to unfairly compete through and with Defendant S&L.**

66.    On January 31, 2012, shortly after deleting 5% of the data on EGS' backup tapes, Defendant Balaban and his wife abruptly resigned from EGS immediately, without notice. The next day, Coble and Mason also resigned immediately. Defendant Balaban, Coble and Mason immediately became employees of Defendant S&L, using EGS' confidential information electronically stolen away on the cloud.

67. As EGS' confidential information and files were being electronically and secretly stolen on an ongoing basis for weeks, Defendant Balaban brought to S&L those stolen files, and EGS', and its clients', confidential and proprietary information, to immediately use in the highly lucrative upcoming February-April 2012 tax lien sale and renewal cycle.

68. On information and belief, relying on the Defendants Balaban's and Herrons' promises of immediate pecuniary gains from EGS' stolen information and files, Defendants Herron and/or S&L has assured expedited compensation or bonuses to Defendant Balaban, Coble and Mason either before or after the closing of the transaction represented by the stolen files in February to April 2012..

69. Upon abruptly leaving EGS' offices on February 1, 2012 in a building owned by him, Defendant Balaban locked his, Coble's and Mason's personal offices to prevent EGS from physically accessing the computers that it owns.

70. Accordingly, the computers that EGS owns that contain forensic evidence of Defendants' ongoing misconduct are still improperly locked in Defendant Balaban's office building, and EGS is improperly denied physical access to them.

71. EGS is highly concerned that evidence of the criminal and civil misconduct of Defendants and the Balaban co-conspirators is being spoliated. Accordingly, EGS needs immediate injunctive relief to have exclusive access to the computers and data that it owns and injunctive relief to avoid spoliation.

72. Defendant Balaban and the Balaban co-conspirators intentionally left the secret Dropbox software planted on EGS' computers. It allows him, Defendants Herron and S&L, Coble, Mason and those acting in concert with them to monitor any access to

or changes to EGS', and its clients', files made by EGS, or EGS' use of its electronic information.

73.     Thus, as planned by them, even after Defendant Balaban resigned from EGS, this concealed Dropbox spy software continues to hack into EGS' computers, and alter and affect its and its clients' electronic data thereon.

74.     To conceal their deletions and electronic theft transfer of the over 78,000 EGS files and information to the "cloud" and to cover up their on-going electronic theft of EGS', and its clients', files and information, Defendants Balaban, Herron, and S&L, in concert with Mason, Coble, and MRS, contrived a phony lawsuit in the Dauphin County Court of Common Pleas on February 2, 2012 alleging that MRS had a proprietary interest in certain EGS' client files, and needed to obtain hard copies of those same files on an emergency basis to complete scheduled tax lien sales of EGS' clients.

75.     Defendants Herron and S&L knew that EGS' files had already been electronically stolen, and placed upon the cloud, but failed to disclose it to the Dauphin County Court.

76.     Under this guise, Defendant Balaban improperly sought the assistance of his self-professed personal friend Judge Lawrence F. Clark, Jr., apparently on an *ex parte* basis on behalf of him and his new employer Defendant S&L, seeking an order requiring EGS to turn over to Defendants Balaban, S&L and Herrons certain of EGS' client files relating to scheduled tax lien transactions.

77.     Defendants Balaban, S&L and Herrons misled Judge Clark into believing that they needed these EGS files to complete scheduled tax lien transactions, when in fact

they had already stolen them electronically, and were monitoring them through their secret "cloud" software.

78.     The real objective of Defendants Balaban, Herrons, and S&L's misrepresentations to Judge Clark was to cover up their electronic theft of EGS', and its clients', files.

79.     To further its conflicts of interest, and in violation of the Pennsylvania Rules of Professional Conduct, including Rule 3.3, mandating candor to a judicial tribunal, Defendant S&L, representing MRS before Judge Clark, and Defendant Balaban, Coble and Mason failed to disclose this secret "cloud" software, and that Defendants had already electronically stolen EGS' documents and information.

80.     The electronic information stolen by Defendant Balaban by using the secret Dropbox spy software, both before and after he was employed at Defendant S&L, continues to be used by and for Defendants Herrons' and S&L's pecuniary benefit, and to the detriment of EGS and its clients.

81.     This continuing improper accessing and hacking into EGS' computer systems by Defendant Balaban, Coble, Mason, and those acting in concert with them, is an irreparable alteration of EGS' protected computers, as Defendant Balaban's secret software continues to allow Defendants to spy on, delete and alter the EGS files.

82.     Defendant Balaban's, Coble's, Mason's, and those acting in concert with them, misconduct continues at Defendant S&L.  Upon information and belief, Defendant Balaban, and his co-conspirators, are using the stolen data on their computers owned by Defendant S&L, allowing this competitor improper access to EGS' confidential trade secrets and confidential and proprietary business information.

83.     Each time Defendants Balaban and S&L open the computers implanted with the secret software or access these stolen documents, they alter EGS' data through, *inter alia*, immediately and irreparably changing the access dates.

84.     Defendants Balaban, S&L and Herron, in concert with Coble and Mason, are obtaining, or attempting to now obtain, substantial fees through the use of the backdoor spy software secretly installed on EGS' protected computer that allows them, as competitors working at S&L, to instantaneously and simultaneously learn of EGS' access to edits to, and review of its, and its clients', confidential information.

85.     As its confidential and proprietary trade secrets are being disseminated and altered on an ongoing basis, EGS is suffering irreparable harm and is without an adequate remedy at law to recover for this ongoing criminal and civil misconduct. Accordingly, EGS is entitled to immediate and permanent equitable relief.

## COUNT I
### Violations of Computer Fraud and Abuse Act
### *EGS v. Defendant Balaban*

86.     EGS incorporates the Complaint's allegations as if fully set forth herein.

87.     Defendants' unlawful misconduct violates the Computer Fraud and Abuse Act, ("CFAA") including 18 U.S.C. §1030(a)(2)(C), §1030(a)(4) and §§ 1030(a)(5)(A)(B) and (C).

88.     Defendant Balaban, and co-conspirators Coble and Mason, are authorized and disclosed agents of Defendants Herron and of their present employer, Defendant S&L, all of whom conspire and cover-up this on-going criminal and civil misconduct.

89.     To obstruct and avoid EGS' monitoring of its computer security systems, Defendant Balaban, and those acting in concert with him, secretly purchased and installed

a computer software program known as "Dropbox" on EGS' desktop computers in EGS' offices and on EGS' office laptop. This secretly allows them to transfer EGS', and its clients', confidential files and information from its computers to a "cloud", an internet based website server, and to continue to access and monitor EGS' computer system.

90.    Defendant Balaban, in concert with Coble and Mason, and those acting in concert with them, who will be identified in discovery and added as defendants, improperly and secretly accessed EGS', and its clients', confidential and proprietary information, and secretly stole over 78,000 EGS files to their "cloud."

91.    EGS' computers, portals, servers, mainframe and document management system(s) and all of their data storage facilities are integrated electronic, data processing and memory devices that perform a plethora of logical and arithmetic functions at high speeds and, as such, are "computers" within the CFAA (hereinafter "EGS' computers").

92.    EGS' computers are used in and affect interstate commerce and are necessarily and routinely used in its multi-state law practice and are attached to, compatible with and work with the internet to allow its employees to access EGS' and its clients' information from around the country and the world and are "protected computer(s)" under the CFAA.

93.    Defendant Balaban, and those acting in concert with him, including Defendants Herron and S&L, Coble, Mason, and others who will be identified in discovery and added as defendants, did so with the intent to defraud EGS. Their misconduct of, *inter alia*, hacking, spying into and unauthorized access into EGS' computers was done in furtherance of their intended frauds.

94.     Defendants' use of, *inter alia*, the unauthorized secret spyware, discussed above, was the transmission of a program, code or command that caused damage to EGS' computers without EGS' knowledge and without its authorization, which is repeated each time Defendants access EGS' computers.

95.     As a result of the criminal and civil misconduct of Defendant Balaban, and those acting in concert with him, the integrity and availability of the data, programs, and information on EGS' computers and systems was, and is, impaired.

96.     EGS incurred costs because of the unlawful misconduct, set forth herein, of Defendant Balaban, and those acting in concert with him, including Coble, Mason, and others who will be identified in discovery and added as defendants, including but not limited to costs in responding to the offenses set forth above, assessing the damage and attempting to restore the matters, data and information on EGS' computers to the condition they were before Defendants' unlawful misconduct.

97.     Both the damage to EGS' computers and losses incurred by EGS, including consequential damages, well exceed $5,000 in the last year. The value of the information Defendants obtained through their unauthorized access to and use of EGS' computers is well in excess of $5,000, as will be further confirmed in discovery.

98.     The misconduct of Defendant Balaban, Coble and Mason, and those acting in concert with them, who will be identified in discovery and added as defendants, while still employed by EGS are independently actionable under the CFAA, including 18 U.S.C. §1030(a)(2)(C), §1030(a)(4) and §1030(a)(5)(A).

99.     EGS' computers hacked into by Defendants and those acting in concert with them now improperly locked in Defendant Balaban's building, are protected

computers used in interstate commerce, as defined by the CFAA.  EGS' server is also an EGS protected computer.

100.    This illegal access of EGS' computers by Defendant Balaban, and those acting in concert with him, including Coble, Mason, and others who will be identified in discovery and added as defendants, through "Dropbox" software, allows them, through Defendant Balaban's "cloud", to access and continue to spy on EGS', and its clients', information without authorization.

101.    Defendant Balaban, and those acting in concert with him, including Coble, Mason, and others who will be identified in discovery and added as defendants, used, and continue to use, their "cloud" to secretly access and steal EGS', and its clients', protected computer information across state lines, and used the information on EGS' computers in interstate commerce.

102.    Defendant Balaban, and those acting in concert with him, including Coble, Mason, and others who will be identified in discovery and added as defendants, deleted at least 5% of the data on EGS' server during the weekend of January 20-22, 2012, just before their abrupt resignation from EGS to join Defendant S&L.

103.    EGS has incurred over $5,000 to attempt to remediate the deletion of data on its protected computer server and the ongoing software surveillance of its computers. The full extent of damages to EGS' protected computer system, can only be ascertained after a forensic examination of EGS' computers, now improperly locked in Defendant Balaban's office building.  Their intentional, secret and continued access of EGS' protected computer information without authorization, has caused damages to EGS, and its clients, during the last one-year period aggregating significantly more than $5,000 in

value, including the impairment to the integrity and availability of data, program, system, or information. EGS' damage includes the reasonable costs of responding to this on-going criminal and civil misconduct, conducting a damage assessment, and attempting to restore EGS', and its clients', data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of services.

104. Further, EGS' losses and damages continue because the information and trade secrets on EGS' computers are no longer exclusively available to it, its clients, and its authorized agents.

105. Defendant Balaban and the Balaban co-conspirators are also liable for knowingly causing the transmission of the Dropbox software and related programs, information, code, or command into EGS' protected computers, and as a result of such misconduct, intentionally causing damage without authorization, to EGS' protected computers, and its, and its clients', confidential and proprietary information and work product.

106. As a direct result of these multiple and continuing violations of the CFAA, Defendants have stolen and obtained items of substantial value which are now being used in furtherance of the Defendants' fraudulent scheme, unfair competition, conversion and breaches of fiduciary duty.

107. EGS has stated a clear right to relief.

108. EGS faces imminent irreparable harm from the hacking into his protected computers.

109.  EGS has no adequate remedy at law to enjoin this ongoing criminal and civil misconduct.

110.  Defendants, and those acting in concert with them, violate the CFAA on an ongoing basis.

**WHEREFORE,** EGS demands an injunction against Defendant Balaban and those acting in concert with him, including Coble, Mason and others, to prevent them from benefiting in any manner from the unauthorized access to EGS' computers and information, and the theft of its, and its clients', confidential and proprietary information and attorney work product, including but not limited to the immediate turnover of all of EGS' computer and data,  and for judgment against them for compensatory damages in excess of this Court's jurisdictional limits, attorneys fees, interest, costs and such further relief as this Court deems appropriate.

**COUNT II**
**Violation of Pennsylvania's Trade Secrets Act**
***Plaintiff EGS v. All Defendants***

111.  EGS incorporates the Complaint's allegations, as if fully set forth herein.

112.  EGS' trade secrets and confidential and proprietary business information was entrusted to Defendant Balaban, Coble and Mason. These trade secrets include, but are not limited to:  the names, addresses and contact persons at EGS' clients; EGS attorney-client and work product strategy communications with its clients; EGS' billing and internal financial records; and, EGS' work product prepared by Defendant Balaban and his associates Coble and Mason, while employed with EGS and now being used by Defendant S&L.

113. Defendant Balaban and the Balaban co-conspirators are authorized and disclosed agents of Defendants Herron and S&L.

114. These trade secrets are not generally known to others, particularly EGS' competitor S&L, who would obtain great economic value from them. EGS' confidential and proprietary business information and trade secrets developed over years of experience, and substantial investment, allows it to maintain an economic advantage over its competitors.

115. EGS takes reasonable measures to protect and maintain the secrecy of its confidential information by restricting access to its proprietary and confidential computer system on which this information is stored.

116. EGS protects its, and its clients', confidential and proprietary information, *inter alia,* through double password access, prohibition of outside software, and requiring immediate return of all of EGS' materials. This protection, known to all attorneys and part of Defendant Balaban's fiduciary obligations, gives rise to a duty to maintain the confidentiality of EGS', and its clients', trade secrets and confidential and proprietary business information for EGS' exclusive benefit.

117. As an essential component of providing its legal services, EGS has invested significant time and economic resources to design, develop and maintain its own document management system, exclusively for its lawyers and employees.

118. EGS developed a secure product to safeguard private client information, utilizing encryption security software, firewall protection software, back up tapes and custom built security features within the document management system. Substantial time and economic resources were dedicated to create custom login using unique username

and password.  EGS' clients are encouraged to be candid with EGS, and provide all facts to EGS.  Accordingly, the documents and information on EGS' document management system are inherently derived from this fiduciary relationship, highly confidential and proprietary, and are extremely sensitive.

119.   Upon hiring an employee, EGS spends time and economic resources training them on the use of the confidential document management system, including the installation of VPN remote secure access to allow EGS' lawyers to access their work product remotely, while EGS can monitor any updates, and ensure the integrity of its, and its clients', files.

120.   Since EGS' protected computer system contains private client data, each lawyer and employee is repeatedly advised of the confidential nature of access to the document system.

121.   Defendant Balaban, Coble and Mason, were provided with a confidential unique individual username and password to access the document management system to manage and access EGS' electronic files and information.

122.   EGS', and its clients', confidential information, and Defendant Balaban's fiduciary, contractual and ethical obligations as an employee, director, officer, and managing shareholder of EGS, and as a member of the Pennsylvania Bar, give rise to a duty to maintain the confidentiality of EGS' trade secrets and confidential and proprietary business information for EGS' exclusive benefit.

123.   EGS' confidential and proprietary business information constitutes "trade secrets" under 12 Pa.C.S. §5302 in that it is comprised of information that:

a.    Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

b.    Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

124.    Defendants are "persons" as defined under 12 Pa.C.S.§ 5302.

125.    Defendant Balaban was trusted with significant responsibilities with EGS' clients during his over ten (10) year employment with EGS.

126.    Defendants Herron and S&L have misappropriated these trade secrets as they knew, or have reason to know, that these trade secrets have been acquired by improper means, including deletion of files, hacking into protected computers and refusing to return EGS' computers and data.

127.    Defendant Balaban and co-conspirators Coble and Mason, and others who will be identified in discovery, misappropriated and converted EGS' trade secrets by:

a.    stealing, converting or otherwise improperly acquiring EGS' trade secrets and confidential and proprietary business information;

b.    stealing, converting or otherwise improperly acquiring EGS' confidential and proprietary business information, including EGS' corporate and business contacts; and,

c.    stealing and wrongfully using EGS' confidential and proprietary business information to attempt to obtain an advantage over EGS.

128.    Both before and after Defendant Balaban, Coble and Mason, and those acting in concert with them, resigned, they secretly and improperly accessed, and

continue to access, EGS' computers, knowingly and intentionally, without authorization, to steal and alter EGS', and its clients', valuable, confidential and proprietary information.

129.    Their failure to return these documents and information of EGS', and its clients', causes substantial and irreparable harm to EGS. For example, client files are required to be retained by EGS, and EGS' attorney work product is owned by it.  EGS has invested substantial economic resources and time in preparing and protecting this work product for its use by its lawyers.

130.    As a proximate result of the Defendants' misconduct of Defendants, and those acting in concert with them, including Coble, Mason, and others who will be identified in discovery and added as defendants, EGS has incurred and will continue to incur damages exceeding $75,000, which damages were foreseeable, including loss of trade secrets and confidential and proprietary business information, loss of customers, and loss of future business.

131.    The misconduct of Defendants, and those acting in concert with them, including Coble, Mason, S&L and others who will be identified in discovery and added as defendants, may also result in the permanent alteration of EGS' data retention, resulting in irreparable harm for which monetary payment alone is insufficient to remedy.

132.    Defendants, and those acting in concert with them, have orchestrated and benefitted from the theft and misappropriation of EGS' trade secrets.

133.    Defendants, and those acting in concert with them, including Coble, Mason, MRS and others, who will be identified in discovery and may be added as defendants, theft and misappropriations constitute intentional acts, or gross neglect of

duty confirming his reckless indifference to EGS' resulting injuries. These are sufficient to raise the presumption that they, and those acting in concert with them are aware of the consequences of their actions. Defendants' misconduct is therefore "willful and malicious" under 12 Pa.C.S. § 5302.

134. Pursuant to 12 Pa.C.S. §§ 5304(b) and 5305, Defendants' willful and malicious theft and misappropriation of EGS trade secrets and confidential and proprietary business information compels an award of exemplary damages in an amount twice that of any monetary damage award, plus an award of reasonable attorney fees, expenses, and costs to EGS.

135. EGS' position was materially and prejudicially changed by the theft of its trade secrets by Defendants, and those acting in concert with them, including Coble, Mason, MRS and others, who will be identified in discovery and may be added as defendants. Monetary damages alone are therefore an inadequate and inequitable remedy for this misconduct causing irreparable harm pursuant to 12 Pa.C.S. § 5304.

136. Defendants' on-going thefts and misappropriations require the issuance of an injunction pursuant to 12 Pa.C.S. §5303 to eliminate the commercial advantage that would otherwise be derived from their misconduct and that of those acting in concert with them.

137. EGS is suffering irreparable harm and is without an adequate remedy at law to recover for this ongoing criminal and civil misconduct. Accordingly, EGS is entitled to immediate and permanent equitable relief, including the immediate return of its computers and data.

**WHEREFORE**, EGS requests that this Court enter an injunction prohibiting Defendants, and those acting in concert with them, from further use of any of its trade secrets and confidential and proprietary business information, and requiring that they disclose the nature and extent of misappropriation and immediately return all computers and data  taken by them. EGS also requests entry of judgment for its damages against Defendants, in excess of $75,000, which amount is to be doubled pursuant to 12 Pa.C.S. §5304(b), plus an award of reasonable attorney fees, expenses, and costs pursuant to 12 Pa.C.S. §5305, and trial by jury on all damages claims.

**COUNT III**
**Conversion**
***EGS v. All Defendants***

138.    EGS incorporates the foregoing allegations, as if fully set forth herein.

139.    As forth above, Defendants Balaban and Herron, and the Balaban conspirators, have stolen and misappropriated trade secrets and confidential and proprietary business information which are EGS' exclusive property and dominion.

140.    These assets are not the property of, or otherwise owned by Defendants or the Balaban conspirators.

141.    After Defendant Balaban's abrupt, without notice, January 31, 2012 resignation, he and his co-conspirators have covered-up their continuing criminal and civil misconduct by preventing EGS's physical access to its own computers that Defendant Balaban, and those acting in concert with him, have locked into EGS' offices, in a building owned by Balaban.  He continues to deny EGS physical access to its own computers.  In light of the deceitful and on-going criminal and civil misconduct set forth herein, EGS is properly concerned that highly relevant information, including on these

computers that it owns, but which are being illegally locked up by Defendant Balaban, is being spoliated by Defendants Balaban, Herron, and S&L, and those acting in concert with them.

142.    To further cover-up his on-going misconduct, Defendant Balaban continues to refuse EGS physical access to the work station computers that it owns, and that were used by Defendant Balaban, Coble and Mason.

143.    Defendants have exercised dominion and control over EGS' property in which they have no legal right or interest.

144.    Defendants have converted, stolen and otherwise taken EGS' property.

145.    Defendants' conversion is willful, wanton and intended to inflict malicious injury upon EGS.

146.    Defendants' conversion has resulted in ongoing losses in excess of $75,000, and EGS is entitled to punitive damages for this malicious conduct.

**WHEREFORE**, EGS respectfully demands judgment against Defendants in excess of $75,000, plus punitive damages, together with court costs and interest, and any other further relief which this Court deems just and proper in light of Defendants' conversion.

**COUNT IV**
**Breach of Fiduciary Duty**
*Plaintiff v. Defendant Balaban*

147.    EGS incorporates the foregoing allegations as if fully set forth herein.

148.    As an employee, officer, director and managing shareholder of EGS, Defendant Balaban had fiduciary duties to act with due care, loyalty, and good faith and was required to act with honesty of purpose and at all times in the best interests of the EGS, its shareholders and clients.

31

149. As a result of his positions, Defendant Balaban was placed in a position of trust concerning EGS' operations and confidential information and proprietary trade secrets.

150. To properly discharge his fiduciary duties, Defendant Balaban was obligated to exercise loyalty, good faith, and due care with respect to EGS' operations, seeking at all times to act for the benefit of all EGS constituencies, including, but not limited to, *inter alia*:

    (a) protect and maximize the assets of EGS and maximize shareholder value, including collection of EGS' due and owing accounts receivable;

    (b) act in the best interests of EGS, and, not subordinate it to the interest of other entities;

    (c) keep all shareholders adequately informed of all material developments;

    (d) avoid any self-dealing transactions that are not disclosed to and approved by disinterested shareholders, and that are entirely fair to EGS;

    (e) avoid secretly placing website-based internet "sharing" "cloud" software associated with Dropbox on the EGS computer systems which has been widely criticized as being unsafe and subject to data breaches;

    (f) conform to the rule of law and not act in an *ultra vires* manner in the hacking into EGS' computers, tortious interference, conversion and violations of the Computer Fraud and Abuse Act; and,

    (g) work to develop business for EGS with the duty of care required to be exercised by directors, and not to operate such business outside such reasonable duty of care by, among other things, determining to favor themselves and related entities to the virtual exclusion of EGS' interests

151. As specifically plead herein, Defendant Balaban repeatedly and secretly violated his fiduciary duties, failing to perform his duties as a prudent director, choosing instead to engage in a series of covert actions and fiduciary breaches to benefit himself, Defendants Herron and S&L and others, including the Balaban co-conspirators.

152.    Defendant Balaban's wrongful actions, both past and present, constitute a breach of the fiduciary duty and duty of loyalty owed by him to EGS.

153.    Defendant's acts alleged above were done willfully and maliciously and/or with wanton and reckless disregard of their fiduciary and loyalty obligations to EGS.

154.    Defendant's wrongful actions have damaged EGS, and have caused and continue to cause EGS immediate and irreparable harm.

155.    Defendants Herron and the Balaban conspirators aided and abetted Defendant Balaban's multiple breaches of fiduciary duty in exchange for pecuniary or other remuneration.

156.    EGS has no adequate remedy at law and granting the requested injunctive relief will serve the public interest of discouraging breaches of fiduciary duties, particularly by licensed attorneys with heightened duties of confidentiality.

157.    Defendant Balaban, if not enjoined, will continue to cause EGS substantial and irreparable harm that outweighs any potential injury to him, if he is enjoined from further breaches of, and from enjoying the illegal fruits of his breaches of fiduciary duty and duty of loyalty.

158.    As a result of Defendant Balaban's breaches of his fiduciary duties, EGS is also entitled to compensatory damages, punitive damages, and forfeiture by Defendant Balaban of all compensation or payments received by him from EGS following his first disloyal act.

159.    EGS is suffering irreparable harm and is without an adequate remedy at law to recover for this ongoing criminal and civil misconduct.  Accordingly, EGS is

entitled to immediate and permanent equitable relief, including the return of its computers and data.

**WHEREFORE,** Plaintiff demands an injunction against Defendant Balaban, and those acting in concert with him, including Defendants Herron, S&L, Coble, Mason, and others, who will be identified in discovery and added as defendants, to prevent him and them, from benefiting from his breaches of fiduciary duty and for judgment against him for damages in excess of this Court' arbitration limits, plus interest and costs, disgorgement of compensation and payments, punitive damages and such further relief this Court deems appropriate.

### COUNT V
### Unfair Competition
### *EGS v. Defendants Balaban and S&L*

160.    EGS incorporates the foregoing allegations as if fully set forth herein.

161.    Defendant Balaban and the Balaban co-conspirators secretly installed backdoor spy software on EGS' protected computer system that allows them as competitors, to instantaneously and improperly access EGS' computer system and also edit and review EGS' confidential documents.

162.    Defendant Balaban, and co-conspirators Coble and Mason, are now employed by Defendant S&L, a competitor law firm, which directly benefits from these electronically stolen files and data.

163.    EGS has been, and is being, damaged by this spy software on its computers, and Defendants Balaban and S&L are benefiting by this criminal and civil misconduct.

164.   This wrongful, criminal and civil misconduct, unless enjoined, will continue to disrupt the ongoing relationship between EGS, and its clients, for both current and prospective matters.

165.   Absent immediate injunctive relief, Defendant Balaban's ongoing misconduct will continue to irreparably harm EGS in ways incapable of being fully calculated and adequately compensated through monetary damages.

166.   Defendant Balaban's misconduct has been, and is, intentional, willful, wanton, malicious and outrageous, and an award of punitive damages is both necessary and appropriate to punish and deter like conduct in the future.

167.   All attorneys fees paid to Defendant Balaban and S&L arising from transactions prepared and documented in any part by EGS and then electronically stolen through this ongoing misconduct must be paid to EGS and, at a minimum, held in the Court's escrow until a final Order remedying this misconduct.

168.   EGS is suffering irreparable harm and is without an adequate remedy at law to recover for this ongoing criminal and civil misconduct.   Accordingly, EGS is entitled to immediate and permanent equitable relief.

**WHEREFORE**, Plaintiff demands an injunction against Defendants Balaban and S&L, and those acting in concert with them to prevent any unjust benefit from this unfair competition, and for judgment against them for damages in excess of this Court's arbitration limits, plus interest and costs, disgorgement of compensation and payments made to Defendant Balaban and Defendant S&L from the inception of this misconduct, punitive damages and such further relief this Court deems appropriate.

## COUNT VI
### Tortious Interference with Present and Prospective Business Relationships
#### *EGS v. Defendants Balaban and Herron*

169.    EGS incorporates the foregoing allegations as if fully set forth herein.

170.    EGS and its clients serviced by Defendant Balaban and the attorneys supervised by him, Coble and Mason, have a valid contract for representation.

171.    Defendant Balaban and the Balaban co-conspirators worked on transactions for many months as EGS employees that are scheduled to close in the next several weeks, at which time EGS is entitled to its attorneys fees.

172.    Defendant Balaban intentionally and improperly interfered with the performance of these contracts by conspiring to secure for himself, and his new law firm, S&L, the benefits EGS had earned through its representation.

173.    EGS trusted its employee, director, officer and managing shareholder, Defendant Balaban, with the heightened responsibility of performing, and supervising, legal services provided for its clients.

174.    From this fiduciary position of trust and responsibility, Defendant Balaban learned EGS' confidential, proprietary, attorney-client, and trade secret information concerning EGS', and its clients', upcoming transactions, and need for legal representation.

175.    Defendant Balaban abused this knowledge, gained in a fiduciary capacity, by inducing MRS and Defendants Herron to renege on their obligation to pay EGS' legal fees and reimbursement of out of pocket costs for legal services.

176.    Defendant Balaban's interference with EGS' confidential client information, contacts with, and contracts with its clients is not justified or privileged, but

is intended to benefit himself, Coble and Mason, his new employer Defendant S&L and Defendants Herron, to the detriment of EGS.

177.   Defendant Balaban and the Balaban co-conspirators interfered with EGS' present contract and obligations owed by MRS, and with EGS' current and prospective business relationships resulting in fees owed for transactions closing in the next several weeks..

178.   EGS paid Defendant Balaban, as a trusted employee, shareholder, officer and managing director, while he was secretly hacking and accessing its protected computers, to electronically steal its, and its clients', confidential and proprietary information, and multiple breaches of his fiduciary duty.

179.   Defendants Herron are presently interfering with EGS' prospective contractual relationships with EGS clients who are purchasers of tax liens, including through advising these clients that the tax lien transactions should now be handled by Defendant S&L.

180.   Defendants Herron's misleading representations affecting EGS' prospective contractual relationships are not privileged.

181.   EGS has an economic interest, through its legal services rendered, and contracts with clients that far exceed this Court's arbitration limits.

182.   All fees paid to Defendants Balaban and/or S&L from these tax lien transactions, and then stolen through this ongoing misconduct must be paid to EGS and, at a minimum, held in the Court's escrow until a final order remedying this misconduct.

183.   Defendant Balaban's and Defendants Herron's on-going, secret misconduct and thefts is intentionally malicious, willful, wanton and outrageous, entitling

EGS to punitive damages against him, and those acting in concert with him, who will be identified in discovery and added as defendants.

WHEREFORE, EGS demands immediate injunctive relief and judgment against Defendants Balaban and Herron for compensatory damages in excess of this Court's arbitration limits, plus interest and costs, punitive damages and such further relief this Court deems appropriate.

## COUNT VII
### Civil Conspiracy and Aiding and Abetting
### *EGS v. All Defendants*

184.   EGS incorporates the Complaint's allegations as if fully set forth herein.

185.   Defendants have conspired directly or indirectly, to steal, convert and/or destroy EGS', and its clients', trade secrets and proprietary and confidential information to interfere with EGS' existing and potential contractual and business relations.

186.   In so doing, Defendants, and those acting in concert with them, including the Balaban co-conspirators have acted, and continue to act, in furtherance of this conspiracy.

187.   Defendant S&L, contrary to its ethical obligations, sponsors and conceals this illegal criminal and civil misconduct for its perceived pecuniary benefit in stealing EGS' clients, particularly in the fees owned from clients in the upcoming lucrative tax lien cycle in February –April 2012 and thereafter.

188.   All attorneys fees paid at closing to Defendants Balaban or S&L arising from or related to the tax lien sales, arising from transactions prepared and documented in any part by EGS and then stolen through this ongoing misconduct must be paid to EGS and, at a minimum, held in the Court's escrow until a final order remedying this misconduct.

189.   Their misconduct constitutes a wrongful combination or agreement to do unlawful acts, or alternatively, a wrongful combination or agreement to do otherwise lawful acts by unlawful means.

190.   These concerted overt acts include, computer spyware secretly installed on EGS' computers, secret emails, meetings, communications and *ultra vires* transactions that will be more fully disclosed in discovery.

191.   Defendants, and those acting in concert with them, including Coble, Mason, S&L and others, who will be identified in discovery and added as defendants, were at all relevant times fully aware of the misconduct complained of in this Complaint, and were further aware that misconduct was tortious and otherwise unlawful.

192.   As set forth above, Defendants, and those acting in concert with them, knowingly and substantially benefited from said tortious misconduct.

193.   As a direct, proximate and reasonably foreseeable result of Defendants' conspiratorial misconduct and overt acts in furtherance of the conspiracy, EGS has and continues to suffer damages.

194.   As a direct and proximate result of the Defendants' conspiratorial misconduct, EGS has suffered, and continues to suffer, financial damages, including out of pocket expenses, fees, lost business opportunities, loss of its confidential and proprietary trade secret information that is its misused by Defendants, and their co-conspirators, including Coble and Mason in the competitive marketplace.

195.   The Defendants' unlawful conspiratorial misconduct is outrageous, intentional, malicious, willful and in blatant disregard for EGS' legally protected rights, and with the intent to harm EGS.

196.   EGS is suffering irreparable harm and is without an adequate remedy at law to recover for this ongoing criminal and civil misconduct.   Accordingly, EGS is entitled to immediate and permanent equitable relief.

**WHEREFORE**, Plaintiff EGS demands an injunction against Defendants, to prevent their continued theft of its trade secrets, and its, and its clients', confidential and proprietary business information, as well as to prevent them from enjoying the benefit of their past, and on-going thefts,  and for judgment against them for damages substantially in excess of this Court's arbitration jurisdiction, punitive damages, plus interest and costs, disgorgement of profits and/or imposition of liability for a reasonable royalty for their unauthorized disclosure or use of a trade secret, and such further relief as this Court deems appropriate.

## JURY TRIAL DEMAND

EGS demands a trial by jury on all legal claims.


OF COUNSEL:
ELLIOTT GREENLEAF &
SIEDZIKOWSKI, P.C.

JOHN M. ELLIOTT
BRUCE W. KAUFFMAN
MARK A. KEARNEY
FREDERICK P. SANTARELLI
ROGER J. HARRINGTON, JR.
925 Harvest Drive; Suite 300
Blue Bell, PA  19422
(215) 977-1000

DATED:  February 8, 2012                    *Counsel for Plaintiff*

40